# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jamal Huff, individually and on behalf of the Proposed Minnesota Rule 23 class, | Civil No. 11-CV-3681 (SRN/JJK) |
| **Plaintiff,** | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| Pinstripes, Inc., | |
| **Defendant**. | |

Anna P. Prakash and Steven Andrew Smith, Nichols Kaster, PLLP, 80 South Eighth Street, Suite 4600, Minneapolis, Minnesota 55402, for Plaintiff

Joel D. O'Malley, Joseph W. Hammell, and Ryan E. Mick, Dorsey & Whitney, LLP, 50 South Sixth Street, Suite 1500, Minneapolis, Minnesota 55102, for Defendant

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Plaintiff's Motion for Partial Summary

Judgment [Doc. No. 47] and Defendant's Motion for Summary Judgment [Doc. No. 51].[1]

For the reasons set forth herein, Plaintiff's motion is granted in part and denied in part

and Defendant's motion is granted in part, denied in part, and denied without prejudice in

---

[1] Plaintiff's Motion to Certify Class [Doc. No. 44], for which oral argument was heard contemporaneously with the instant motions, remains under advisement and is not addressed herein. The parties' arguments and supplemental submissions with respect to the calculation of damages primarily bear on class certification issues and are therefore not addressed in this Order.

part.

## I.    BACKGROUND

In this diversity jurisdiction labor law case, Plaintiff Jamal Huff challenges the tip-pooling practice of his former employer, Defendant Pinstripes, Inc. ("Pinstripes").  Huff filed this action individually and on behalf of a proposed class.  (Compl. ¶¶ 62-70 [Doc. No. 1].)   Under a provision of the Minnesota Fair Labor Standards Act ("MFLSA"), an employer may not require an employee to contribute or share a gratuity with another employee, although employees may voluntarily share gratuities.  Minn. Stat. § 177.24, subd. 3 (the "tip-sharing statute").  Huff asserts a claim for violation of the tip-sharing statute (Count One), as well as alternative common law claims for conversion (Count Two) and unjust enrichment (Count Three).  (Compl. ¶¶ 71-81; 82-86; 87-90 [Doc. No. 1].)

From October 2010 to September 2011, Huff worked as a server and bartender at Pinstripes, a restaurant and entertainment venue in Edina, Minnesota, owned by Defendant Pinstripes, Inc., a Delaware corporation. (Answer ¶ 1 [Doc. No. 9].) Pinstripes offers bowling, bocce ball, banquet spaces and other amenities, in addition to a bistro dining service.  (Training Manual at 5, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)

Pinstripes employs a variety of staff, including servers, server assistants, hosts, and bartenders.  (Id. at 14; 30; 50; 59.)  Defendant's service employees may work "regular service" shifts in a restaurant setting, which Pinstripes refers to as "bistro service," and "event service shifts" in a banquet or private event setting.  (Compl. ¶¶ 12-13 [Doc. No.

1].)   While the instant motions concern Defendant's overall role in tipping procedures, the Court addresses two main sub-issues: (1) the distinctions between the work of servers and server assistants, primarily in bistro service; and (2) Defendant's role and participation, if any, in the distribution of tips in event service.

### A.      Gratuity Practices for Regular Bistro Service

Defendant's "servers" function as waiters and waitresses:  they greet customers, take food and drink orders, serve food and drinks, and bus tables.  (Training Manual at 31, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)  Pinstripes's Training Manual identifies the four priorities of a server as follows: (1) "immediate greet/first round drink;" (2) "hot food hot/cold food cold/bar drinks" (servers are to serve food and drinks in a timely fashion, preserving the temperature of the food and drinks); (3) "full hands in/full hands out" (servers are to ensure a flow of food coming in and used dishes going out); and (4) "immediate bus."  (Id. at 31; 47.)  A primary server, or "homebase server," is assigned to particular tables in the Pinstripes restaurant area.  (Huff. Dep. at 111, Ex. A to O'Malley Decl. [Doc. No. 54-1]; Training Manual at 32, Ex. 10 to Prakash Decl. [Doc. No. 50-1].)  The training manual defines "homebase server" as the "server ultimately responsible for the table."  (Training Manual at 65, Ex. 10 to Prakash Decl. [Doc. No. 50-10]; see also Ahn Dep. at 98-99, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)   The primary server coordinates the sequence of service when other servers assist the primary server. (Training Manual at 32, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)  Other servers may assist the primary server with such tasks as filling water glasses, delivering food to tables,

3

answering customer questions, and responding to customer complaints.  (Huff Dep. at 112, Ex. A to O'Malley Decl. [Doc. No. 54-1].)

As acknowledged by Defendant's 30(b)(6) witness, the main job of server assistants "is to assist the servers in any way."  (Ahn Dep. at 101, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)   Pinstripes's Training Manual describes the "two main priorities" of server assistants as bussing tables and stocking.  (Training Manual at 60, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)  Defendant's organizational chart depicts server assistants at the lowest level of service staff, below bartenders, hosts, and servers.[2] (Organization Chart, Ex. 21 to Prakash Decl. [Doc. No. 50-21].)  While server assistants are considered the "backbone" of Defendant's service, its 30(b)(6) witness acknowledged that "they are the support staff."  (Ahn Dep. at 101, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)  Pinstripes's Training Manual similarly describes the supporting role of server assistants:  "Server Assistants act as constant support for the Servers throughout the shift, helping with set up, stocking, and break down."  (Training Manual at 60, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)   Server Assistants are responsible for "maintain[ing] and execut[ing] the service flow."  (Id.)   Plaintiff testified that without server assistants, Pinstripes would "grind to a halt."   (Huff Dep. at 178, Ex. A to O'Malley Decl. [Doc. No. 54-1].)

---

[2] For purposes of comparison, on the food preparation side of the organizational chart, kitchen prep staff and dishwashers occupy the lowest level, directly below cooks. (Id.)

4

As to bussing tables, Pinstripes's Training Manual states, "Server Assistants assist Servers in the immediate bus." (Id.)   In addition, server assistants may greet and seat customers (Ahn Dep. at 31-32, Ex. 1 to Prakash Decl. [Doc. No. 50-1]), bring bread to tables (Huff Dep. at 101-02, Ex. A to O'Malley Decl. [Doc. No. 54-1]), deliver food (id. at 101-02), fill and refill water glasses (id. at 101), box customers' leftover food (id. at 101-02), and pre-bus and bus tables (id. at 101-02; 113-14).   While server assistants may occasionally seat customers, as would a host, they do so very infrequently.  (Ann. Dep. at 31-32, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)  Server assistants are not assigned to particular tables, but "float freely" throughout the restaurant.  (Huff Dep. at 125, Ex. A to O'Malley Decl. [Doc. No. 54-1].)  Server assistants interact with customers in the following ways: they may speak directly with customers, observe customers' cues, and make eye contact with customers when removing or placing dishes on the table. (Emerick Dep. at 54-55, Ex. D to O'Malley Decl. [Doc. No. 54-2]; Brink Dep. at 38, Ex. E to O'Malley Decl. [Doc. No. 54-2]; Cooper Dep. at 31; 36-37, Ex. F to O'Malley Decl. [Doc. No. 54-2]; Martinez Decl. ¶ 7 [Doc. No. 62].)  Plaintiff and another former Pinstripes server contend that, in their experience, the limited English-speaking ability of many server assistants inhibited the ability of these server assistants to respond to the questions of English-speaking customers.  (Huff Dep. at 113-14, Ex. A to O'Malley Decl. [Doc. No. 54-1]; Emerick Decl. ¶ 6 [Doc. No. 67-1].)

Unlike servers, server assistants do not enter customers' orders on Defendant's point-of-sale system.  (Ahn Dep. at 103-04, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)

Furthermore, Pinstripes requires that its servers and bartenders pass a liquor certification

class, but not its server assistants.  (Id. at 95.)  Pinstripes also does not require server

assistants to have a wine key or lighter because they generally do not open bottles of wine

for customers.  (Id.)

Defendant provides checklists to server assistants for each shift, listing the duties

that they are to perform at the beginning and end of a shift.  (Ahn Dep. at 195, Ex. 1 to

Prakash Decl. [Doc. No. 50-1].)  The server assistants' checklists include cleaning and

set-up/take-down duties, such as checking table alignment, lighting candles, stocking wait

stations, checking restrooms, putting up chairs, cleaning the mop room, emptying trash

cans, stocking bar products, and breaking down the bread station.  (Server Assistant

Checklist at PIN2595, Ex. 17 to Prakash Decl. [Doc. No. 50-17].)

Defendant's front-of-the-house managers prepare weekly "service focus notes" for

distribution to their respective servers and server assistants.  (Ahn Dep. at 181-82, Ex. 1

to Prakash Decl. [Doc. No. 50-1].)  In the weekly service focus notes, managers

communicate the point of service on which management wishes to focus.  (Id. at 182-83.)

Of the service focus notes produced in this litigation, the notes for servers frequently

contain descriptions of food and beverages to be relayed to customers, whereas the notes

for server assistants generally list three points: "footspeed, moving with a purpose, and

table turns."  (Service Focus Notes, Ex. 20 to Prakash Decl. [Doc. No. 50-20].)  One of

the service notes for server assistants mentions talking to customers: "hello when

dropping bread."  (Id. at PIN3685.)

Defendant maintains that server assistants "perform many of the same customer services that servers perform, in an assistant role." (Def.'s Mem. Supp. Mot. for Summ. J. at 4 [Doc. No. 53]; Martinez Decl. ¶ 4 [Doc. No. 62]; Lauzon Decl. ¶ 5 [Doc. No. 61]; Rasmussen Decl. ¶7 [Doc. No. 63].) Because Pinstripes considers server assistants and servers to be providing "joint customer service," it requires servers to pay a "tip share" consisting of 2% of their total sales to server assistants and 1.5% of their total sales to bartenders.[3] (Def.'s Mem. Supp. Mot. for Summ. J. at 7 [Doc. No. 53]; Training Manual at 44-45, Ex. A to Ahn Decl. [Doc. No. 55].) Defendant's 30(b)(6) witness Lida Ahn confirmed that participation in the tip pool is required of Pinstripes's servers:

> Q:    So servers are required to pay a certain percentage into tip share?
>
> A:    Yeah.

(Ahn Dep. at 68-69, Ex. 1 to Prakash Decl. [Doc. No. 50-1].

Ahn also noted that the job title of "server assistant" is "pretty unique to Pinstripes." (Id.) Plaintiff and other former Pinstripes servers analogized the work of Pinstripes's server assistants to that of bussers in other restaurants in which they had previously been employed. (Huff Dep. at 123-24, Ex. 3 to Prakash Decl. [Doc. No. 50-3]; Emerick Decl. ¶ 5 [Doc. No. 67-1]; Brink Decl. ¶ 4 [Doc. No. 67-2].) In certain contexts, Pinstripes itself has compared the role of server assistants with that of bussers. For example, prior to opening its Edina restaurant, Pinstripes conducted Minnesota-based

---

[3] Plaintiff's claim alleging a violation of the tip-sharing statute is limited to the portion of gratuities distributed to server assistants, not bartenders. (Pl.'s Mem. Supp. Mot. for Summ. J. at 7, n.9 [Doc. No. 46].)

tip-sharing market research.  (Ahn Dep. at 168, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)

Because other restaurants do not use the "server assistant" nomenclature, Ahn testified

that Pinstripes collected busser information, finding the busser position analogous to

Pinstripes's "server assistant" position.  (Id.)

As to Defendant's procedure for recording and distributing servers' tip shares,

customer sales are recorded using a point-of-sale system called Micros.  (Ahn Dep. at 33,

Ex. 1 to Prakash Decl. [Doc. No. 50-1].)  The Micros system identifies each sale

attributable to a particular server.  (Id. at 34.)  At the end of a shift, Pinstripes's servers

print out a Micros "cash-out" receipt listing the individual server's total sales.  (Id. at 35-

36.)  On the receipt are the server's name and identification number, the net sales for the

server during the shift, the portion of sales paid by credit card and cash, the amount of

credit card tip, and the amount of cash to be exchanged in order for Defendant to have the

value of all of the customers' bills.  (Id. at 35-51; Lauzon Receipt, Ex. 5 to Prakash Decl.

[Doc. No. 50-5].)  Servers use this receipt to 'settle up with the house' – specifically, with

the front-of-the-house manager – for the servers' respective shifts.  (Ahn Dep. at 34; 38,

Ex. 1 to Prakash Decl. [Doc. No. 50-1].)   As Defendant's 30(b)(6) witness explained, "If

the server receives cash transactions for their tabs, then they pay the house the amount for

the sales.  If the server receives more credit card transactions for their tabs, then the house

pays them for the – for their tips."  (Id. at 34.)    During this cash-out process, the front-

of-the-house manager collects the server's tip-out amounts, which are then allocated to

server assistants and bartenders.  (Id. at 73.)  At the end of the shift, when all of the server

and bartender cash-outs are complete, the front of the house manager calculates the

distribution of tips based on the number of hours worked by the server assistants and

bartenders.  (Id. at 74.)

**B.** **Gratuity Practices for Event Service**

In addition to Plaintiff's allegations regarding Defendant's bistro service gratuity

practices, Plaintiff alleges that Defendant's event service gratuity practices also violate

Minn. Stat. § 177.24, subd. 3.  (Compl. ¶¶ 51-61 [Doc. No. 1].)  Defendant's "event

customers," i.e., customers for whom Pinstripes provides banquet and special event

service, are assessed a flat service charge of 20% of the event subtotal.  (Ahn Dep. at 109,

Ex. B to O'Malley Decl. [Doc. No. 54-1]; Montgomery Dep. at 13-14, Ex. C to O'Malley

Decl. [Doc. No. 54-1].)   Of that service charge, approximately 10-12% is distributed to

servers, bartenders, and server assistants working at the event in question.  (Huff Dep. at

92; 96, Ex. A to O'Malley Decl. [Doc. No. 54-1]; Ahn Dep. at 118-19, Ex. B to O'Malley

Decl. [Doc. No. 54-1]; Montgomery Dep. at 13, Ex. C to O'Malley Decl. [Doc. No. 54-

1].)   Of the remaining 8%, Pinstripes retains approximately 5.5% to cover the cost of the

event and also distributes 2.5% to the event managers involved in the booking,

management, and planning of a given event.  (Ahn Dep. at 128; 130, Ex. B to O'Malley

Decl. [Doc. No. 54-1]; Montgomery Dep. at 15-19, Ex. C to O'Malley Decl. [Doc. No.

54-1].)

In his Complaint, Plaintiff asserts that this practice violates the tip-sharing statute,

denying servers and bartenders the full value of the gratuities given by customers.

(Compl. ¶ 61 [Doc. No. 1].)  Plaintiff also alleges that Defendant fails to provide notice that the additional 20% charge is not a gratuity for servers and bartenders.  (Id. ¶ 57.) Plaintiff alleges that customers pay the 20% fee, believing it to be a gratuity for wait staff, and do not leave additional money for wait staff.  (Id. ¶¶ 58-59.)

Pinstripes' Minnesota and Illinois Events Director Sandie Montgomery testified that event managers inform customers that a portion of the event service charge is distributed to wait staff and a portion is retained by Pinstripes to offset labor costs, although customers are not typically informed of the specific percentage break-down. (Montgomery Dep. at 30-32, Ex. C to O'Malley Decl. [Doc. No. 54-1].)   At the end of an event, a Pinstripes manager reviews the event check with the customer, explaining that a portion of the service charge is distributed to wait staff.  (Rasmussen Decl. ¶ 9 [Doc. No. 63]; Lauzon Decl. ¶ 10 [Doc. No. 10].)   Former Pinstripes servers Josh Emerick and Jaclyn Brink attest that while they often overheard event management informing customers that the 20% charge was a wait staff gratuity, they did not recall management telling customers that only a portion of the percentage was distributed to wait staff. (Emerick Decl. ¶¶ 9-10 [Doc. No. 67-1]; Brink Decl. ¶¶ 7-8 [Doc. No. 67-2].)  However, current Pinstripes servers Todd Rasmussen and Amber Lauzon contend that they have observed managers informing event customers that only a portion of the gratuity is distributed to wait staff.  (Rasmussen Decl. ¶ 9 [Doc. No. 63]; Lauzon Decl. ¶ 10 [Doc. No. 61].)

### C.       Summary Judgment Motions

Plaintiff moves for partial summary judgment on his claim alleging a violation of Minn. Stat. § 177.24, subd. 3, or in the alternative, his claim for conversion.  (Pl.'s Mot. Summ. J. at 1 [Doc. No. 47].)   Plaintiff contends that Defendant's server assistants are indirect service employees.  By requiring servers to share tips with server assistants, Plaintiff argues that Pinstripes violates the tip-sharing provision of the MFLSA, Minn. Stat. § 177.24, subd. 3.    (Pl's. Mem. Supp. Mot. for Summ. J. at 13 [Doc. No. 46].) Huff argues that not only does Pinstripes require its servers to participate in the tip pool, it determines the percentage of servers' tips that are to be pooled, rather than allowing servers to voluntarily agree to pool tips and to make any percentage tip-sharing determinations themselves.  (Id.)

Alternatively, Plaintiff argues that he is entitled on summary judgment on his conversion claim.  Under this common law theory, Huff contends that Pinstripes took servers' gratuities without lawful justification.  (Pl's. Mem. Supp. Mot. for Summ. J. at 21 [Doc. No. 49].)  In response to Defendant's summary judgment motion, Plaintiff clarified that he does not contest summary judgment on his common law claims as they relate to the event service.  (Pl.'s Opp'n Mem. at 36, n.16 [Doc. No. 68].)  He does, however, seek summary judgment on his conversion claim as it relates to tip sharing for regular bistro service.  (Id.)

In its cross motion for summary judgment, Pinstripes essentially presents the same argument in support of its motion as it does in opposition to Plaintiff's motion (as does

Plaintiff with respect to its motion and response to Defendant's motion).  Pinstripes

argues that its tip-pooling is lawful and justified because Pinstripes utilizes a "team-

based" approach to customer service and that server assistants provide "direct service" to

the customer.  (Def.'s Mem. Supp. Mot. for Summ. J. at 4-7 [Doc. No. 53].)   Pinstripes

contends that employees serving customers as a team may lawfully divide gratuities.  (Id.

at 12.)  As to its event service, Pinstripes maintains that its wait staff receive the majority

of the 20% service charge and that its customers understand that the service charge is not

solely for wait staff.  (Id. at 8-11.)   Accordingly, Defendant asserts that it is entitled to

summary judgment on Plaintiff's statutory claim.

Defendant also seeks summary judgment on Plaintiff's common law claims for

unjust enrichment and conversion.  (Id. at 21.)  Pinstripes argues that such claims are

unavailable when other adequate legal remedies are available.  (Id.)  In addition,

Defendant argues that Huff's common law claims fail on the merits.  (Id.)  Pinstripes

maintains that because its tip-sharing distribution is lawful, Plaintiff's unjust enrichment

claim fails as a matter of law.  (Id.)  Furthermore, as to Huff's conversion claim based on

tip pooling, Pinstripes contends that Huff cannot show an entitlement to, or property

interest in, the shared gratuities "since the Minnesota divided-gratuities rule clearly

envisions that gratuities received from team service are not the property of a single

server."  (Id. at 22.)  As to Plaintiff's conversion claim based on the event service fee,

Pinstripes contends that when an employee's right to gratuities exists only under the

MFLSA, the employee may not bring an action for conversion to recover gratuities. Id.

(citing <u>Olson v. Moorhead Country Club.</u>, 568 N.W.2d 871, 875 (Minn. Ct. App. 1997)).

Accordingly, Pinstripes moves for summary judgment on all of Plaintiff's claims.

## II.   DISCUSSION

### A.   Summary Judgment Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  <u>Enter. Bank v. Magna Bank of Missouri</u>, 92 F.3d 743, 747 (8th Cir. 1996).  However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  <u>Id.</u> at 323; <u>Enter. Bank</u>, 92 F.3d at 747.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

### B.   Tip Sharing

The tip-sharing provision of the MFLSA,  Minn. Stat. § 177.24, subd. 3, in effect

from August 1, 2009 to July 31, 2011, provided:

> **Sharing of gratuities**. For purposes of this chapter, any gratuity received by an employee or deposited in or about a place of business for personal services rendered by an employee is the sole property of the employee. **No employer may require an employee to contribute or share a gratuity received by the employee with the employer or other employees or to contribute any or all of the gratuity to a fund or pool operated for the benefit of the employer or employees**. This section does not prevent an employee from **voluntarily and individually** sharing gratuities with other employees. The agreement to share gratuities must be made by the employees **free of any employer participation**. The commissioner may require the employer to pay restitution in the amount of the gratuities diverted. If the records maintained by the employer do not provide sufficient information to determine the exact amount of gratuities diverted, the commissioner may make a determination of gratuities diverted based on available evidence and mediate a settlement with the employer.

Minn. Stat. 177.24, subd. 3 (2009) (emphasis added).[4]

> The revised statute, in effect from August 1, 2011 to the present, provides:

> **Sharing of gratuities**. For purposes of this chapter, any gratuity received by an employee or deposited in or about a place of business for personal services rendered by an employee is the sole property of the employee. **No employer may require an employee to contribute or share a gratuity received by the employee with the employer or other employees or to contribute any or all of the gratuity to a fund or pool operated for the benefit of the employer or employees.** This section does not prevent an employee from voluntarily sharing gratuities with other employees. **The agreement** to share gratuities must be made by the employees **without employer coercion or participation**, except that an employer may:

> (1) upon the request of employees, safeguard gratuities to be shared by

---

[4]    The portion of the MFLSA applicable to tip sharing, Minn. Stat. § 177.24, subd. 3, was revised in May 2011.  Because Plaintiff was employed at Pinstripes from October 2010 to September 2011, both the 2011 version of the statute and the earlier 2009 version apply here.  For purposes of this Court's analysis, however, any differences in statutory language are minimal and do not alter the Court's legal conclusions.

employees and disburse shared gratuities to employees participating in the agreement;

(2) report the amounts received as required for tax purposes; and

(3) post a copy of this section for the information of employees.

The commissioner may require the employer to pay restitution in the amount of the gratuities diverted. If the records maintained by the employer do not provide sufficient information to determine the exact amount of gratuities diverted, the commissioner may make a determination of gratuities diverted based on available evidence and mediate a settlement with the employer.

Minn. Stat. § 177.24, subd. 3 (2011) (emphasis added).  Both the earlier version and current version of the tip-sharing statute prohibit employers from requiring "an employee to contribute or share a gratuity received by the employee with the employer or other employees or to contribute any or all of the gratuity to a fund or pool operated for the benefit of the employer or employees."  Cf. Minn. Stat. § 177.24, subd. 3 (2009) and Minn. Stat. § 177.24, subd. 3 (2011).

An employee may bring a private action for violations of provisions of the MFLSA, including the tip-sharing statute.  Minn. Stat. § 177.27, subd. 8 (2009).  An employer who pays an employee less than the amount to which the employee is entitled is liable for the full amount of wages, gratuities, and overtime compensations, less any amounts actually paid to the employee, plus an additional equal amount as liquidated damages.  Id.  Attorneys' fees and costs are to be awarded where an employer is found to have violated the MFLSA.  Id., subd. 10.

In addition, a Minnesota Department of Labor and Industry regulation, the

"divided gratuities rule," addresses shared gratuities, providing as follows:

> **Divided gratuities**. When more than one direct service employee provides
> direct service to a customer or customers in a given situation such as
> banquets, cocktail and food service combinations, or other combinations,
> money presented by customers, guests, or patrons as a gratuity and divided
> among the direct service employees is not a violation of Minnesota Statutes,
> section 177.24, subdivision 3.

Minn. Admin. R. 5200.0080, subp. 8.  A "direct service employee" is defined in the same
rule:

> **Direct service employee**.  A "direct service employee" is one who in a
> given situation performs direct service for a customer and is to be
> considered a tipped employee.  An indirect service employee is a person
> who assists a direct service employee, these include, but are not limited to,
> bus people, dishwashers, cooks, or hosts.

Minn. Admin. R. 5200.0080, subp. 6.

In Delsing v. Starbucks Coffee Corp., 08-CV-1154 (PJS/JSM), 2009 WL 3202378,

*9 (D. Minn. Sept. 30, 2009), this Court examined how the divided gratuities rule is to be

applied.  The Plaintiffs in Delsing asserted that the manner in which Starbucks distributed

gratuities left in tip jars was violative of Minn. Stat. § 177.24, subd. 3.  2009 WL

3202378, at *1.  Starbucks collected tips left by customers in tip jars, distributing them to

individual employees on a weekly basis in proportion to the number of hours the

employees worked during a given week performing direct customer service (although the

employees might perform "modest amounts of indirect service," such as wiping tables or

restocking cups and lids).  Id. This Court examined the language of the tip-sharing statute

regarding tips  "deposited in or about a place of business," Minn. Stat. § 177.24, subd. 3,

16

as well as the divided gratuities rule, Minn. Admin. R. 5200.0080, subp. 8, finding the

divided gratuities rule most applicable to the practice of depositing gratuities in a tip jar.

Id. at *5.  The rule was "best interpreted to apply to tips left in a tip jar (or the equivalent)

and to permit employers to require direct-service employees to share such tips among

themselves (though not with the employer)."  Id. at *6.  The Court noted  that the rule

does not explicitly state that tip jar gratuity sharing may be required among employees

who work as a team.  Id.   However, given that Minn. Stat. § 177.24, subd. 3 permits

voluntary tip-sharing, the Court reasoned that "the most likely purpose of the divided-

gratuities rule is to permit employers to require tip sharing in some situations," such as tip

jar gratuity sharing.[5]  Id.

Under Minn. Admin. R. 5200.0080, subp. 8, the Court noted that direct service

employees can be required to share tips only if they work together "in a given situation

such as banquets, cocktail and food service combinations, or other combinations. . . ."  Id.

at *7.  Finding that the "given situation" at Starbucks that "looks most like a banquet" is a

specific shift, as opposed to a weekly distribution based on the total number of direct

service hours worked per week, id. at *7-8, the Court then considered how to determine

which employees qualified as direct-service employees:

---

[5]  The Court observed that in contrast with Minn. Admin. R. 5200.0080, subp. 8,
the tip-sharing statute speaks only of "'personal services rendered by an employee' – that
is, services rendered by an individual employee – and does not clearly address services
rendered by a team of employees."  Id.   The Court thus concluded that the tip-sharing
statute, Minn. Stat. § 177.24, subd. 3, "seems to have in mind the traditional tip left on a
table by a restaurant patron or handed to a guide by a tourist."  Id.

> [a] direct-service employee is one who, over the course of a shift, is primarily engaged in "perform[ing] direct service for. . . customer[s]. . . ." Likewise, an indirect-service employee is one who, over the course of a shift, works primarily as a "bus [person], dishwasher [ ], cook[ ], or host[ ]," or in some other capacity in which she primarily "assists a direct service employee...."  Just as a direct-service employee does not become an indirect-service employee by doing a modest amount of indirect service (such as bussing a table), an indirect-service employee does not become a direct-service employee by doing a modest amount of direct service (such as refilling a coffee cup for a customer).

Id. at *8-9 (citing Minn. Admin. R. 5200.0080, subp. 6.)  Although the Court was unable to make a factual determination as to which employees were direct service employees in light of the undeveloped record, "if a Starbucks employee is primarily engaged in performing direct service for customers during a particular shift, then she may be regarded as a direct-service employee for that entire shift, and may be permitted to share in a tip jar during that shift."  Id. at *10.   The Court found that Starbucks' policy violated Minnesota law by requiring employees working on a particular shift to share tips with employees who did not work on that shift.  The Court further held that "if a Starbucks employee is primarily engaged in performing direct service for customers during a particular shift, then she may be regarded as a direct-service employee for that entire shift, and may be permitted to share in a tip jar during that shift."  Id. at *10.

The enactment history of the divided gratuities rule includes a 1986 Statement of Need and Reasonableness from the State of Minnesota Labor Standards Division. (Statement of Need and Reasonableness, Ex. A to Supp'l O'Malley Decl. [Doc. No. 84-

1].)   A portion of the statement indicates that Subpart 8 of Minn. Admin. R. 5200.0080 is

reasonable

> because it restates that concept of 'main' by defining those individuals who
> provide the 'main' service as 'direct' service employee, and by defining
> those individuals who do not customarily provide the 'main' service as
> 'indirect' employees.  Thus the proposed rule assumes that there will be
> occasions where the customer may expect that the tips would be divided
> among the direct service employees.

(Id. at 5.)

### 1.     Regular Bistro Service

As to the portion of Plaintiff's statutory claim concerning regular bistro service,

Plaintiff argues that Defendant operates a system in which its direct employees (servers)

are required to share their gratuities with indirect employees (server assistants), in clear

violation of the tip-sharing statute.  (Pl's. Mem. Supp. Mot. for Summ. J. at 1 [Doc. No.

49].)  Plaintiff contends that the divided gratuities rule, applied in Delsing, is inapplicable

here, and that under the MFLSA and Delsing, server assistants are indirect employees.

(Id. at 1-2.)  Defendant, however, argues that the divided gratuities rule contemplates that

more than one employee may provide the main service.  (Def.'s Mem. Supp. Mot. for

Summ. J. at 12-13. [Doc. No. 53].)  Pinstripes contends that its server assistants provide

the direct service of serving tables, or are primarily engaged in serving tables.  (Id. at 14-

17.)  Relying on Delsing, Pinstripes argues that under this team approach to providing

service, its server assistants are permitted to share in the tips given to the server.  (Id. at

15.)

The Court finds that there are no disputed issues of material fact with respect to Defendant's role in regular bistro service tip-sharing.  Pinstripes requires its servers to give 2% of their tips to server assistants, as set forth in its training manual, and verified by its 30(b)(6) witness.  (Training Manual at 44-45, Ex. A to Ahn Decl. [Doc. No. 55-1]; Ahn Dep. at 68-69, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)  At the end of a server's shift, the server cashes out, settling up with the house.   (Ahn Dep. at 73-74, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)  At that point, Pinstripes takes the additional tip amounts to be shared with server assistants. (Id.)    Both the former and current versions of Minn. Stat. § 177.24, subd. 3 prohibit employers from requiring employee participation in tip-pools.  Minn. Stat. § 177.24, subd. 3 (2009) and Minn. Stat. § 177.24, subd. 3 (2011).  The facts demonstrate that Pinstripes requires its servers to share tips and that Pinstripes participates in the process.

The question then is whether server assistants provide direct service.  Defendant argues that its unique team approach to service takes it outside the realm of the tip-sharing statute.   (Def.'s Mem. Supp. Mot. for Summ. J. at 1-2 [Doc. No. 53].)  The divided gratuities rule acknowledges that where more than one direct service employee provides direct service in a given situation, such as a banquet, tips divided among the direct service employees do not violate the tip-sharing statute.  Minn. Admin. R. 5200.0080, subp. 8.

The Court finds that the divided gratuities rule is not applicable to the regular bistro service at Pinstripes.  As noted by this Court in Delsing, the divided gratuities rule

"fills a gap" not addressed by the tip-sharing statute – it covers those situations, such as banquets or where tips are left in a tip jar, in which a group of servers (or other staff) provide direct service to a group of customers. <u>Delsing</u>, 2009 WL 3202378, at *6.   In contrast, the tip-sharing statute applies to basic restaurant service. <u>Id.</u> (stating, "Read as a whole, then, the tip-sharing statute seems to have in mind the traditional tip left on a table by a restaurant patron. . . ."). The situation here is the direct opposite of that in <u>Delsing</u> – here, where basic restaurant service is at issue, it is the tip-sharing statute that applies.

Even considering the divided gratuities rule as guidance, the facts show that server assistants are <u>not</u> direct service employees.   Although Defendant has submitted declarations from current Pinstripes employees attesting that, in their opinion and experience, server assistants perform many of the same duties as servers, the employees nonetheless acknowledge that certain duties remain exclusively in the servers' domain. (Martinez Decl. ¶ 4 [Doc. No. 62]; Lauzon Decl. ¶ 5 [Doc. No. 61]; Rasmussen Decl. ¶7 [Doc. No. 63].)   By their own admissions, servers alone take orders, use Pinstripes's point of sale system, initially greet customers at tables, and even teach customers how to play bocce. (<u>Id.</u>) These are job duties involving direct customer service.   However, just as current Pinstripes employees contend that servers and server assistants perform the same duties, Plaintiff has submitted declarations from former Pinstripes employees attesting to the opposite – that servers and server assistants perform different duties, with the duties of the server assistant analogous to those of a busser.   (Huff Dep. at 123-24,

Ex. 3 to Prakash Decl. [Doc. No. 50-3]; Emerick Decl. ¶ 5 [Doc. No. 67-1]; Brink Decl. ¶ 4 [Doc. No. 67-2].)

Despite these different subjective perspectives, the uncontested objective evidence – found in Pinstripes's own documents and submitted in the testimony of its own witnesses – is overwhelming and determinative.  As the title "server assistant" implies, Pinstripes's Training Manual defines the job of server assistants as assisting the server by acting "as constant support for the Servers."  (Training Manual at 60, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)  Pinstripes's 30(b)(6) witness described the primary job of server assistants as "to assist the servers in any way," acknowledging that server assistants "are the support staff."  (Ahn Dep. at 101, Ex. 1 to Prakash Decl. [Doc. No. 50-1].)  In contrast, the training manual describes the role of the "homebase server" as the person having ultimate responsibility for a given table.  (Training Manual at 65, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)   Servers may assist each other as well, but a homebase server – not a server assistant – is responsible for taking customer orders, entering the orders into the point-of-sale system, and taking customers' payments.  (Training Manual at 31, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)   Even current Pinstripes employees acknowledge that it is the duty of servers alone to initially greet customers, take orders, and enter sales into the point of sale system.   (Martinez Decl. ¶ 4 [Doc. No. 62]; Lauzon Decl. ¶ 5 [Doc. No. 61]; Rasmussen Decl. ¶7 [Doc. No. 63].)   These are significant, defining direct service duties.  If server assistants and servers truly performed the same duties, then Pinstripes would have no need for the two job titles.  However, the Training

Manual and the organizational chart make clear that the two positions are, in fact, different.

Further, as this Court observed in <u>Delsing</u>, the tip-sharing statute is singular, referring to "personal services rendered by an employee." 2009 WL 3202378, at *6. Notably, the tip-pooling at Pinstripes is directly tied to the individual server's table, tacitly recognizing that just as the server bears the ultimate responsibility for service at a table, the server is ultimately responsible for the tip.

Although Defendant emphasizes the degree of interaction between its server assistants and customers, customer interaction is not the touchstone of determining who is a direct service employee.  If that were the case, as Plaintiff argues, restaurant hosts would be considered direct service employees.  As noted in <u>Delsing</u>, "[j]ust as a direct-service employee does not become an indirect service employee by doing a modest amount of indirect service (such as bussing a table), an indirect-service employee does not become a direct-service employee by doing a modest amount of direct service (such as refilling a coffee cup for a customer)."  2009 WL 3202378, at *9.  Rather, the focus is on whether the employee is primarily engaged in direct service work.

While Pinstripes uses the title "server assistant," the work of Pinstripes's server assistants is analogous to that of bussers in other restaurants.  (Huff Dep. at 123-24, Ex. 3 to Prakash Decl. [Doc. No. 50-3]; Emerick Decl. ¶ 5 [Doc. No. 67-1]; Brink Decl. ¶ 4 [Doc. No. 67-2]; Training Manual at 60, Ex. 10 to Prakash Decl. [Doc. No. 50-10].) Pinstripes's Training Manual describes the two main priorities of server assistants as

bussing tables and stocking.  (Training Manual at 60, Ex. 10 to Prakash Decl. [Doc. No. 50-10].)  In addition, Defendant's weekly service focus notes repeatedly emphasize the stocking and bussing duties of server assistants – only one entry refers to speaking with customers, and then only to acknowledge customers with a hello.  (Service Focus Notes at PIN3685, Ex. 20 to Prakash Decl. [Doc. No. 50-20].)   In defining a "direct service employee" under the divided gratuities rule, indirect service employees, including "<u>bus people</u>, dishwashers, cooks, or hosts" are specifically excluded from the definition of direct service employees.   Minn. Admin. R. 5200.0080, subp. 6 (emphasis added).   In <u>Delsing,</u> this Court likewise categorized bussing as indirect service, as well as activities like stocking ("restocking cups and lids").  2009 WL 3202378, at *8-9.

At the hearing on these motions, counsel for Defendant raised an issue of fairness, noting that server assistants play an important role in the tips earned by servers, and should receive a portion of the servers' tips.  Plaintiff himself acknowledges the important role played by server assistants, noting that without them, Pinstripes would "grind to a halt."  (Huff Dep. at 178, Ex. A to O'Malley Decl. [Doc. No. 54-1].)  The tip-sharing statute, however, does not account for everyone and everything that may have contributed to the tip – it simply prohibits employers from requiring and participating in tip-pools.  Minn. Stat. § 177.24, subd. 3.   Likewise, the fact that some current Pinstripes employees profess their approval of the tip-sharing arrangement (Lauzon Decl. ¶ 8 [Doc. No. 61]; Rasmussen ¶ 10 [Doc. No. 63]), is not relevant to the question of whether Defendant

violated the statute.  Rather, under the statute, servers are free to distribute portions of their tips as they choose. Id.

For all of the foregoing reasons, the Court finds that server assistants are indirect service employees and that Defendant's actions in requiring its servers to share tips with server assistants, and by participating in the tip-sharing process, violate Minn. Stat. § 177.24, subd. 3.  Plaintiff's motion for partial summary judgment on its statutory tip-sharing claim as it relates to regular bistro service is therefore granted.  Defendant's summary judgment motion regarding this claim is denied.

### 2. Event Service

As noted, Plaintiff challenges Defendant's actions regarding the 20% service fee assessed for event service, arguing that Pinstripes retains a portion of the amount and fails to give notice to customers that the entire service charge is not a gratuity for wait staff, in violation of Minn. Stat. § 177.24, subd. 3.  (Compl. ¶¶ 56-57 [Doc. No. 1].)  Defendant moves for summary judgment on this claim, arguing that the event service charge is not a gratuity, nor can it reasonably be so construed.  (Def's. Mem. Supp. Mot. for Summ. J. at 17-18 [Doc. No. 53].)  In response, Plaintiff argues that material issues of fact preclude summary judgment on this issue, particularly in light of a February 4, 2013 Eighth Circuit opinion, Luiken v. Domino's Pizza, LLC, 705 F.3d 370 (8th Cir. 2013), filed after the close of discovery in this case.  (Pl's. Opp'n Mem. at 27-28 [Doc. No. 68].)  The fact discovery deadline in the instant case was November 21, 2012.  (Am. Pretrial Sched. Order of 10/15/12 at ¶ 2 [Doc. No. 41].)

As noted, the tip-sharing statute prohibits an employer from requiring an employee to contribute or share gratuities received by the employee with the employer or other employees.  Minn. Stat. § 177.24, subd. 3 (2009); Minn. Stat. § 177.24, subd. 3 (2011). Rather, "any gratuity received by an employee . . . is the sole property of the employee."

Id.  The MFLSA defines gratuities as

> monetary contributions received directly or indirectly by an employee from a guest, patron, or customer for services rendered and includes an obligatory charge assessed to customers, guests or patrons which might reasonably be construed by the guest, customer, or patron as being a payment for personal services rendered by an employee and for which no clear and conspicuous notice is given by the employer to the customer, guest, or patron that the charge is not the property of the employee.

Minn. Stat. § 177.23, subd. 9 (2007).  A Minnesota Department of Labor and Industry regulation provides further guidance, stating:

> obligatory charges which might reasonably be construed by the guest, customer, or patron as a sum to be given to the employee as payment for personal services rendered, include, but are not limited to, service charges, tips, gratuities, and/or surcharges which are included in the statement of charges given to the customer.

Minn. Admin. R. 5200.0080, subp. 4a.  Another portion of this regulation specifies the requirements for notice that the obligatory charge is not a tip:

> Clear and conspicuous notice that the obligatory charge is not a gratuity is notice clearly printed, stamped, or written in bold type on the menu, placard, the front of the statement of charges, or other printed material given to the customer.  Type which is at least 10 point (one-fourth inch) on the placard or 9 point (one-eighth inch) or larger on all other notices is clear and conspicuous.

Minn. Admin. R. 5200.0080, subp. 4b.

26

In Luiken, the Eighth Circuit considered an interlocutory appeal of a district court decision granting class certification to a group of pizza delivery drivers.  705 F.3d at 372.  The pizza delivery drivers alleged that a fixed delivery charge that customers paid Domino's was a gratuity withheld by Domino's in violation of the tip-sharing statute, Minn. Stat. § 177.24, subd. 3.  Id.  Domino's implemented a flat $1 delivery charge in 2008, of which delivery drivers received no part.  Id.  Some drivers explained this to customers, while some did not, and disclosure varied based on the method of order.  Id.  Online purchasers received notice that "delivery charges will apply," and employees taking telephone orders were instructed to say the same.  Id.  Delivered boxes of pizza contained a statement of charges listing the delivery charge.  Id.  Credit card receipts included a blank line for tips and listed the delivery charge in the pre-tip "amount" line.  Id.  In late 2009, Domino's began printing the following message on some of its boxes: "Any Delivery Charge is not a tip paid to your driver.  Please reward your driver for awesomeness."  Id.

Applying the class certification requirements of Rule 23, the district court found that "the underlying contention that customers might reasonably have construed the delivery charge as payment to Domino's delivery drivers for personal services rendered" was capable of class resolution.  Luiken, 277 F.R.D. 395, 399 (D. Minn. 2011), rev'd and remanded, 705 F.3d at 378.  The district court further noted "that whether the fact-specific circumstances articulated by Domino's resulted in a customer's actual belief that the delivery charge was not a tip for the delivery driver is not an issue the Court will be

27

tasked with deciding." <u>Id.</u> (citing <u>In re Alleged Labor Law Violation of Chafoulias</u> <u>Mgmt. Co.</u>, 572 N.W.2d 326, 329-31 (Minn. Ct. App. 1997)).   In <u>Chafoulias</u>, on which the district court relied, the administrative law judge found that a service charge appearing on a statement of charges presented to a customer "falls squarely within the terms of Minn. Admin. R. 5200.0080, subp. 4a." <u>Chafoulias</u>, Minn. OAH Docket No. 12-1900-10284-2, 1996 WL 907909, *7 (Aug. 13, 1996).   In response to the employer's argument that there was insufficient evidence demonstrating a customer's "reasonable belief," the administrative law judge found such evidence unnecessary:

> this issue does not require the testimony or opinion of customers or employees.   It is a legal question as to whether a reasonable person would construe the charges as being a payment for personal services rendered by an employee.   Thus, there are no fact issues in this regard.

<u>Id.</u> at *8.   Relying on <u>Chafoulias</u>, the district court in <u>Luiken</u> thus found that fact-specific evidence of customers' actual beliefs was unnecessary to the determination that the plaintiffs' tip-sharing claim was capable of classwide resolution.   <u>Luiken</u>, 277 F.R.D. at 399.

On appeal in <u>Luiken</u>, in an opinion filed on February 4, 2013, the Eighth Circuit reversed and remanded.   <u>Luiken</u>, 705 F.3d at 378.   The appellate court found that "context matters in determining whether customers might reasonably construe an obligatory charge as payment to employees for personal services rendered." <u>Id.</u> at 374 (citing <u>Chafoulias</u>, 572 N.W.2d at 326; <u>In re Alleged Labor Law Violation of Gangelhoff Inv., Inc.</u>, Minn. OAH Docket No. 5-1900-7252-2 (Apr. 28, 1993)).   The Eighth Circuit reasoned:

. . . [T]he plain language of the statute and rule indicate that context matters. Rule 5200.0080 lists service charges and surcharges as examples of "obligatory charges which might reasonably be construed by the guest, customer, or patron. . . as payment for personal services."  This does not mean that they must be so construed.  The statute and rule's use of "the" – "which might reasonably be construed by the guest, customer, or patron. . . " – indicates that they refer to someone specific. . . .  The customer's circumstances determine whether the delivery charge might reasonably be construed as a payment for personal services.  If, for example, Luiken explained to the customer that the delivery charge was not a gratuity (as he sometimes did), that customer could not reasonably believe otherwise – and no notice would be required.

***

Some pizza customers asked about the charge and some did not; some employees volunteered that it was not a gratuity and some did not. Those circumstances determine the objective reasonableness of construing the charge as a payment for personal services.

Id. at 373-74 (citations omitted).  Accordingly, the Eighth Circuit found that fact-specific context was relevant to the application of Minn. Stat. § 177.23 and Minn. Admin. R. 5200.0080, and remanded the matter to the district court.  Id. at 375-76.

Defendant identifies five points in support of its position that customers cannot, and do not, reasonably construe Pinstripes's service charge solely as a gratuity.  (Def's. Mem. Supp. Mot. for Summ. J. at 18 [Doc. No. 53].)  First, Defendant's employees attest that Pinstripes reviews documents with its event customers, noting that the service charge is not only a wait staff gratuity.  (Montgomery Decl. ¶ 3 [Doc. No. 56].)

Second, Pinstripes avers that its event managers who communicate to event customers confirmed that the service charge is not solely a wait staff gratuity. (Montgomery Dep. at 29-30, Ex. C to O'Malley Decl. [Doc. No. 54-1]; Event Order, Ex.

29

A to Montgomery Decl. [Doc. No. 56-1]; Beise Decl. ¶¶ 5-6 [Doc. No. 54-1].)  Defendant

contends that its staff reviews the event check with each customer, explaining that

customers may leave a tip for the staff.  (Montgomery Dep. at 42-45, Ex. C to O'Malley

Decl. [Doc. No. 54-1]; Ahn Dep. at 146-47; 213; 224, Ex. B to O'Malley Decl. [Doc. No.

54-1]; Beise Decl. ¶ 7 [Doc. No. 57]; Rasmussen Decl. ¶ 9 [Doc. No. 63]; Lauzon Decl. ¶

10 [Doc. No. 61]; Johnson Decl. ¶¶ 10-11 [Doc. No. 60].)  In addition, Pinstripes'

employees contend that staff review the invoice with each customer, explaining that a

portion of the 20% service charge goes to staff, but that customers may leave an

additional gratuity.  (Ahn Dep. at 215, Ex. B to O'Malley Decl. [Doc. No. 54-1]; Johnson

Decl. ¶ 10 [Doc. No. 60].)

Third, Defendant maintains that "no customer reasonably would conclude that a

charge for which he or she must pay sales tax is a gratuity."  (Def.'s Mem. Supp. Mot. for

Summ. J. at 20 [Doc. No. 53].)  Pinstripes maintains that the documents provided to event

customers make clear that the state sales tax is applied to the service charge.  (Id.) (citing

Event contract, Ex. A to Montgomery Decl. [Doc. No. 56-1]; Event Service Invoice, Ex.

L to Ahn Decl. [Doc. No. 55-2]; Event Service Check, Ex. M to Ahn Decl. [Doc. No. 55-

2].)

Fourth, Defendant contends that a 20% gratuity is "outside the normal range for a

gratuity."  (Id.)  In support of this point, Pinstripes cites a 1994 study of Minnesota

restaurants.  (Id.) (citing Örn B. Bodvarsson & William A. Gibson, Gratuities and

Customer Appraisal of Service: Evidence from Minnesota Restaurants, 23 Journal of

Social-Economics 287 (1994), Ex. I to O'Malley Decl. [Doc. No. 54-2].) Courts have construed charges outside the normal range of a tip as charges not likely to be considered a mere gratuity by the customer. See Chafoulias, 572 N.W.2d at 330; In re Alleged Labor Law Violation of Gangelhoff Inv., Inc., Minn. OAH Docket No. 5-1900-7252-2 (Apr. 28, 1993).

Fifth, Pinstripes contends that its customers' actual behavior confirms the customers' understanding that they are free to leave a gratuity in addition to the 20% service charge. (Def.'s Mem. Supp. Mot. for Summ. J. at 20-21 [Doc. No. 53].) Many customers leave a tip in addition to the 20% service charge, either before, during, or after the event. (Huff Dep. at 163, Ex. A to O'Malley Decl. [Doc. No. 54-1]; Montgomery Dep. at 66; 70; 137-38, Ex. C to O'Malley Decl. [Doc. No. 54-1]; Ahn Dep. at 120-21; 232, Ex. B to O'Malley Decl. [Doc. No. 54-1]; Johnson Decl. ¶ 11 [Doc. No. 60].)

As noted, Plaintiff argues that issues of material fact preclude summary judgment on this portion of its statutory claim. (Pl.'s Opp'n Mem. at 27-28 [Doc. No. 68].) Plaintiff's counsel contends that prior to the Eighth Circuit's decision in Luiken, Plaintiff believed that his event service charge claim "could be decided on the fact that the charge at issue was a service charge and the fact that Defendant had not provided 'clear and conspicuous' statutory notice that the charge was not a gratuity." (Prakash Aff. ¶ 6 [Doc. No. 72].) Plaintiff contends there was no indication, prior the Eighth Circuit's ruling, "that the claim turned on what each customer might have reasonably construed the service charge to be payment for. . . ." (Id. ¶ 6.) Plaintiff therefore argues that Defendant's

motion must be denied because there are material disputes of fact regarding the information provided to Defendant's customers.  (Id. ¶ 9.)

In addition, Plaintiff contends that Pinstripes' evidence is deficient – the evidence does not demonstrate the belief of each and every Pinstripes customer.  (Id.)   Plaintiff argues that he lacks sufficient discovery to respond to whether all of Pinstripes' event service customers might have reasonably construed the 20% service charge to be payment for personal services rendered and/or how much of the charge was construed as payment for personal services rendered.  (Id. ¶ 10.)  For these reasons, Plaintiff contends Defendant's motion for summary judgment with respect to the event service claim should be denied.  Alternatively, Plaintiff requests leave for additional discovery, to include the following: (1) discovery from Defendant's customers; (2) discovery of Defendant's electronic system; and (3) discovery of Defendant's current and former front-of-house managers.[6]  (Id. ¶ 12.)

_____

[6]  Specifically, Plaintiff seeks the following additional discovery:

a.  *Discovery from Defendant's customers.* Plaintiff should be allowed to question (informally or through deposition) each of Defendant's event customers. Plaintiff intends to only question the "host" customers (i.e., the customer that paid and/or signed the check at the end of each event). These customers are the only people who can explain what they construed the service charge to be at the time of payment.

b.  *Discovery of Defendant's electronic system.* Plaintiff does not believe that whether a "gratuity" column or "additional gratuity" line was shown to customers is dispositive or controlling of the issue in this case. However, to the extent Defendant continues to argue that such things matter, Plaintiff should have the opportunity to respond not just with law but also with facts.  Accordingly, Plaintiff should be allowed to image or otherwise inspect Defendant's electronic

The Court finds that disputed issues of material fact preclude summary judgment on Plaintiff's event service claim.  First, given the context-specific requirements of Luiken, Defendant's current evidence lacks the necessary specificity to establish what each event service customer might have reasonably construed the service charge to cover. In addition, both sides point to different evidence in the record about the information that Pinstripes conveyed to its event customers.  On the one hand, former Pinstripes servers attest that while they often overheard event management informing customers that the 20% charge was a wait staff gratuity, they did not recall management telling customers that only a portion of the percentage was distributed to wait staff.  (Emerick Decl. ¶¶ 9-10 [Doc. No. 67-1]; Brink Decl. ¶¶ 7-8 [Doc. No. 67-2].)  On the other hand, current Pinstripes servers contend that they have observed managers informing event customers

---

"ReServe" system. As discussed in Plaintiff's opposition brief, the system stores a record of changes to the system.  Plaintiff should be allowed to compare the time any "additional gratuity" was added to an event with the time the event check would likely have been presented to the guest to determine what exactly each guest was given in terms of paperwork.

c.  *Discovery of Defendant's current and former front-of-house managers.* Defendant's front-of-house managers are the ones that explain the service charge to customers at the end of each event. Defendant has not produced a witness with firsthand knowledge of what each and every front-of-house manager told each and every customer at each event. Plaintiff did not depose the managers during discovery because the state of the case law was such that, in Plaintiff's Counsel's opinion, individual accounts of oral representations were irrelevant. Given the recent legal developments, Plaintiff's Counsel request permission to take this discovery.

(Prakash Aff. ¶ 12 [Doc. No. 72].)

that only a portion of the gratuity is distributed to wait staff.  (Rasmussen Decl. ¶ 9 [Doc. No. 63]; Lauzon Decl. ¶ 10 [Doc. No. 61].)

Given the state of the law at the close of discovery, Plaintiff reasonably concluded that it did not require context-specific fact discovery regarding its event service claim. The Court therefore denies Defendant's motion without prejudice as to Plaintiff's statutory event service claim.[7]  Plaintiff may conduct the requested discovery, limited at this time to the events at which Plaintiff Huff worked.   (Prakash Aff. ¶ 12 [Doc. No. 72].) This discovery shall completed within 60 days.

### C.   Common Law Claims

Plaintiff asserts common law claims for conversion and unjust enrichment based on Defendant's alleged actions in retaining a portion of gratuities received by Plaintiff and others, and exercising control over the tip-sharing practice.  (Compl. ¶¶ 82-86; 87-88 [Doc. No. 1].)  Defendant moves for summary judgment on both claims.  Defendant argues that Plaintiff may not pursue equitable claims when other adequate legal remedies exist.  (Def.'s Mem. Supp. Mot. for Summ. J. at 21-22 [Doc. No. 53].)  Moreover, even if

---

[7]  While it appears that Plaintiff moved for summary judgment on all aspects of his statutory claim – based on regular bistro service and event service – given Plaintiff's alternative argument in opposition to Defendant's summary judgment motion that disputed fact issues may preclude summary judgment as to event service, the Court concludes that Plaintiff seeks summary judgment on his statutory claim with respect to bistro service only.  To the extent that Plaintiff seeks summary judgment on his statutory claim with respect to event service, it is denied without prejudice.

the Court were to consider Plaintiff's common law claims, Defendant argues that they fail on the merits.  (Id.)

While Plaintiff moves for summary judgment on its conversion claim, at the hearing on the parties' motions, counsel for Plaintiff conceded summary judgment to Defendant on the common law claims with respect to the event service charge.  Plaintiff's counsel noted that as to the service charge claims for conversion and unjust enrichment, the only property right at issue would be created by the MFLSA.   Under Olson, 568 N.W.2d at 875, Plaintiff could not therefore bring an action for conversion to recover the event-related gratuities.  Defendant's motion for summary judgment as to conversion with respect to Plaintiff's event service claim is therefore granted.  However, Plaintiff's counsel argued that the conversion claim based on bistro service tip sharing is viable because it is based on a percentage of sales.  Plaintiff therefore seeks summary judgment on his conversion claim as it relates to bistro service tip sharing.

Under Minnesota law, a party may not have equitable relief where an adequate remedy at law is available.  United States v. Bame, 721 F.3d 1025, 1030 (8th Cir. 2013) (citing ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn. 1996)).  "Unjust enrichment is an equitable remedy. Thus, '[r]elief under the theory of unjust enrichment is not available where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature.'" (Id.) (citing Southtown Plumbing, Inc. v. Har–Ned Lumber Co., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992)). This Court has likewise held that "the availability of statutory claims (whether state or

federal) will preclude the assertion of an unjust-enrichment or other equitable claim seeking the same relief." <u>Cummins Law Office, P.A. v. Norman Graphic Co. Ltd.</u>, 826 F. Supp.2d 1127, 1132 (D. Minn. 2011).

Plaintiff's common law claims for unjust enrichment and conversion regarding tip-sharing for regular bistro service are based on the same facts as those supporting his claims under Minn. Stat. § 177.24, subd. 3.  (Compl. ¶¶ 82-90 [Doc. No. 1].)  Not only does the tip-sharing statute provide an adequate legal remedy, this Court has granted Plaintiff that very legal remedy as it relates to the regular bistro service tip-sharing portion of Huff's claim, *supra*.   In addition, Plaintiff makes clear that he asserts his common law claims only in the alternative, stating, "the unjust enrichment and conversion claims arise only if the Court holds that Plaintiff does not have a legal remedy under the MFLSA for amounts contributed to the tip pool."  (Pl.'s Opp'n Mem. at 36 [Doc. No. 68].)   Because Plaintiff has an adequate statutory remedy as to his regular bistro service tip-sharing claim, which this Court has granted, and because Plaintiff concedes summary judgment to Defendant on his conversion claim with respect to event service, Plaintiff's motion for summary judgment as to his conversion claim is denied, and Defendant's motion for summary judgment as to Plaintiff's claims for conversion and unjust enrichment is granted.

### D.    Motion for Class Certification

As noted, Plaintiff's Motion for Class Certification, for which the parties submitted separate briefing and supplemental materials, remains under advisement.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Plaintiff's Motion for Partial Summary Judgment [Doc. No. 47] is

**GRANTED IN PART** as to his statutory claim based on regular bistro

service (Count One), and **DENIED IN PART** as to his claim for conversion

(Count Two);

2.    Defendant's Motion for Summary Judgment [Doc. No. 51] is **GRANTED**

**IN PART** as to Plaintiff's claims for unjust enrichment and conversion

(Counts Two and Three), **DENIED IN PART** as to Plaintiff's statutory

claim based on regular bistro service (Count One), and **DENIED**

**WITHOUT PREJUDICE** in part as to Plaintiff's statutory claim based on

event service (Count One);

3.    Plaintiff may conduct additional discovery related to his statutory claim

based on event service as set forth herein, within 60 days; and

4.    The parties are ordered to contact Magistrate Judge Jeffrey Keyes' chambers

immediately to schedule a settlement conference which must occur in the

next 60 days.


Dated:    September 26, 2013

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge